THE STATE OF OHIO, APPELLEE, *v.*
CONGENI, APPELLANT.

(No. 43108—Decided November 12, 1981.)

*Mr. John T. Corrigan,* prosecuting attorney, for appellee.

*Mr. Hyman Friedman,* county public defender, for appellant.

PATTON, P.J. William Congeni, Harry Bezak and James Burke were indicted for crimes arising out of an incident that occurred on February 21, 1980. Burke pled guilty; however, Congeni and Bezak pled not guilty and were tried together by a jury. Both were convicted of two counts of carrying a concealed weapon. Each filed separate appeals which were never consolidated.[1] The within appeal concerns appellant Congeni only.

I

Congeni's first assignment of error states:

"The trial court erred in denying appellant's motion to suppress evidence which resulted in a violation of appellant's Fourth and Fourteenth Amendment rights."

Prior to trial, a hearing was held on Congeni's motion to suppress. The following evidence was adduced at this hearing.

At 10 a.m. on Thursday, February 21, 1980, the SWAT Unit of the Cleveland Police Department was in attendance for roll call. The officers of the SWAT Unit were informed that a robbery was to take place that day. Specifically, the officers were told that Mrs. Myer, the owner of the Forest Brook Tavern, would go to the Union Commerce Bank at Berea and Triskett Roads at 1 p.m., where she would be robbed. The police were also told that Mrs. Myer customarily withdrew a large amount of money on Thursdays so that she could cash payroll checks for her patrons who worked in nearby factories. A James Burke and a man named O'Dell would be involved in the robbery, and the escape was to be made in a car parked on Interstate 90. The car would have its hood up as if to appear disabled. With this information, four to five police units went to work.

Patrolmen Ferrara and Churko were assigned as a decoy squad. Dressed in civilian clothes, they rode in an unmarked purple Gremlin. They met Mrs. Myer at her tavern, where they told her about the anticipated robbery and what the police planned to do. Mrs. Myer told them that she had heard the name Burke before and that she would cooperate with the police. The officers also had a description of Burke.

Meanwhile, two other police officers of the SWAT Unit, Patrolmen Velkoff

[1] *State* v. *Bezak,* Cuyahoga App. No. 43107, unreported, was released on October 1, 1981.

and Long, stationed themselves in a marked police car on Interstate 90, where said highway runs behind the Union Commerce Bank. They pretended to be a traffic radar enforcement unit. While waiting there, they noticed a black 1977 Dodge Charger driven by Burke pass them and pull into the outside lane, that lane abutting the property adjacent to the Union Commerce Bank.

The other SWAT Units assigned to this case were stationed at various points in the vicinity of the Union Commerce Bank.

In conformance with her custom, Mrs. Myer went to the Union Commerce Bank at 1 p.m. Patrolmen Ferrara and Churko, in the purple Gremlin, followed her to the bank. They parked the car and noticed co-defendant Harry Bezak walking around the parking lot. Bezak was acting nervously and in a suspicious manner. The officers also observed the black vehicle parked on Interstate 90 that had been observed by Officers Velkoff and Long.

Mrs. Myer entered the bank. Congeni followed her inside. After a few minutes, the officers saw her exit the bank, and Congeni followed right behind her. As Mrs. Myer was walking toward her car, Bezak, who was standing outside the bank entrance and acting nervously, walked behind her along with Congeni. At the same time, Burke exited from the vehicle on Interstate 90, walked down the hill to the bank parking lot and shouted to Bezak and Congeni, "Come, here."

Congeni responded, "No, not now."

Again, Burke yelled, "Come here quick."

Congeni and Bezak heeded Burke's warnings and followed him back to the car parked on Interstate 90. Burke got into the back seat, Congeni sat in the passenger's seat, and Bezak sat behind the wheel. Bezak started the car and took off proceeding eastbound on Interstate 90. Patrolmen Velkoff and Long followed approximately twenty-five feet behind them. Burke, seated in the back seat,

turned around and looked at Officers Velkoff and Long. Bezak, Congeni and Burke exited Interstate 90 at West 117th Street. While exiting, Burke once again turned and looked back at Officers Velkoff and Long. Another police car, with Patrolmen Kneu and Murray, who had been assigned to this case, assisted Officers Velkoff and Long in following Burke, Bezak and Congeni, Bezak continued on West 117th Street until he reached Berea Road. At the intersection of West 117th street and Berea Road, there was a red light. Bezak proceeded through the red light and turned onto Berea Road. At this point, Patrolman Velkoff observed Burke, as he stated it, "swimming around" in the back seat. In addition, Burke again looked back at the police in a suspicious manner. Officer Velkoff also saw Congeni turn around and say something to Burke.

Via radio, Officer Velkoff informed his superior, Lieutenant Balough, of the events that had taken place. The lieutenant told him to pull the car over and arrest the three males. Officer Velkoff pulled the car over and along with patrolmen Long, Kneu and Murray, ordered Burke, Bezak and Congeni to get out of the car and to put their hands on the roof of the car. The police placed the males under arrest and advised them of their rights. Officer Velkoff then proceeded directly to the back seat, where he recovered two weapons, a .22 Magnum Derringer two-shot loaded with two live rounds and a .380 Automatic loaded with five live rounds, from the crevice of the seat. Officer Velkoff testified that since the three men, who were at this point standing next to the car, were within reaching distance of the guns, Velkoff feared for the officers' safety. He also stated that it was standard procedure to take an inventory search of such a car before it was to be towed.

In his first assignment of error, Congeni contends the trial court erred in denying his motion to suppress the evidence

394

taken from the automobile. For the reasons discussed below, we find no merit to this assignment.

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

By its very terms, the Fourth Amendment does not prohibit *warrantless* searches and seizures; it only prohibits *unreasonable* searches and seizures. While the Supreme Court has consistently stated that searches without warrants are *per se* unreasonable, the court has nevertheless recognized "a few specifically established and well-delineated exceptions"[2] to that general rule. Three of these exceptions are (1) the search conducted incident to a lawful arrest; (2) the automobile exception; and (3) the stop and frisk exception. The search of the automobile in which Congeni was a passenger fits into all three exceptions.

1. The Search Incident to a Lawful Arrest Exception

In *Weeks* v. *United States* (1914), 232 U.S. 383, 392, the Supreme Court first noted the right on the part of the government to search the person of the accused when legally arrested. One rationale for this rule was that police need to seize the evidence of the crime to prevent its destruction. Another rationale was that the police officers need to protect themselves. See *Chimel* v. *California* (1969), 395 U.S. 752; *Agnello* v. *United States* (1925), 269 U.S. 20.

The issue which typically arises when a search is conducted incident to an arrest is whether the scope of the search went beyond the arrestee's person. If so, the search will be held unreasonable. See *Chimel, supra.* In the instant case, Congeni does not argue that the search went beyond his person.[3] What he argues is that the search was not proper because the arrest was not lawful.

Officer Velkoff stated that when he arrested Congeni, Bezak and Burke, he did not inform them of what crime they were being arrested for. However, at the hearing, Officer Velkoff stated he arrested them for conspiracy to commit the crime of robbery. Before Congeni's arrest for conspiracy can be found by this court to be lawful, there must be sufficient evidence in the record to establish that the arresting officer had probable cause to believe that Congeni had committed a crime. *Draper* v. *United States* (1959), 358 U.S. 307.

In *Draper,* a narcotics agent was given information by a reliable informant that Draper had gone to Chicago and was going to bring back via train three ounces of heroin on either the morning of September 8th or 9th. The agent also received a detailed physical description of Draper. On September 9th, the agent saw Draper alight from a train arriving from Chicago, and without first obtaining a warrant, the agent conducted a search of his person incident to such arrest. The question before the Supreme Court was whether the agent had probable cause to effectuate the arrest. The court found that these facts established probable cause and quoted *Carroll* v. *United States* (1923), 267 U.S. 132, which held that probable cause exists where " 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a

[2] *Katz* v. *United States* (1967), 389 U.S. 347, 357.

[3] Officer Velkoff specifically testified that the three men were within reaching distance of the guns after they were arrested.

man of reasonable caution in the belief that' an offense has been * * * committed." *Draper* at 313. See, also, *State* v. *Heston* (1972), 29 Ohio St. 2d 152 [58 O.O.2d 349], certiorari denied 409 U.S. 1038; *State* v. *Fultz* (1968), 13 Ohio St. 2d 79 [42 O.O.2d 259], certiorari denied 393 U.S. 854; *State* v. *Young* (1966), 8 Ohio App. 2d 51 [37 O.O.2d 53].

In the instant case, the arresting officers had probable cause for several reasons to believe Congeni had committed a crime. First, the officers had detailed information regarding a robbery that was to take place at the Union Commerce Bank. Second, the officers' observations confirmed the information they received. They saw Congeni follow Mrs. Myer into the bank and exit the bank right behind her and Bezak acting suspiciously and nervously outside the bank and proceeding to follow Mrs. Myer along with Congeni. They also overheard the conversation where Burke warned Bezak and Congeni, and they observed the three leave via a car parked on Interstate 90. A man of reasonable caution would believe that an offense had been committed. We note that it is irrelevant that the informant who tipped the police remained unidentified. In *Heston,* the Ohio Supreme Court held that where an unidentified informer's tip is corroborated by evidence uncovered by independent police work verifying the tip, there is sufficient information to establish probable cause for an arrest. As the facts in the instant case reveal, there was sufficient evidence uncovered by the police to corroborate the tip.

Accordingly, we hold that Congeni's arrest was lawful and the search conducted incident thereto was not unreasonable.

## 2. The Automobile Exception

The automobile exception to the Fourth Amendment prohibition against warrantless searches and seizures was first enunciated in *Carroll* v. *United States, supra.* The exception is based upon the fact that automobiles, unlike buildings, are mobile and it is therefore often impracticable to secure a warrant.[4] So long as the police have probable cause to believe the vehicle contains evidence or contraband, they can stop and search it.[5] The occupants need not be placed under arrest prior to the search.[6] In *Carroll,* the court found probable cause to exist where governmental agents who knew defendants had been bootlegging whiskey stopped their auto and found contraband liquor. The court held that the facts and circumstances within the agents' knowledge and of which they had reasonably trustworthy information, were sufficient in themselves to warrant a man of reasonable caution in the belief that intoxicating liquor was being transported in the auto they stopped. In a case almost identical to *Carroll, Brinegar* v. *United States* (1949), 338 U.S. 160, 176, the Supreme Court emphasized that probable cause and not mere suspicion was the basis upon which such searches must be conducted.

In the instant case, the police had probable cause to stop the vehicle. First, the police had received a tip that a robbery was to take place at the Union Commerce Bank and that James Burke would be involved. In conformance with the tip, the police found Burke there. Second, Bezak acted in a suspicious manner as he stood in the parking lot. Third, Burke's warnings, "Come, here" after he had walked down from Interstate 90 where the police car was stationed, gave police

---

[4] *United States* v. *Ortiz* (1975), 422 U.S. 891; *Chambers* v. *Maroney* (1970), 399 U.S. 42; *Carroll, supra.*

[5] *Oritz, supra; Chambers, supra; Carroll, supra.*

[6] *Husty* v. *United States* (1931), 282 U.S 694; *Carroll, supra.*

reason to suspect Burke was aware of police surveillance. Fourth, the furtive gestures, *i.e.*, the turning to look at the police and the "swimming around" on the part of Burke when he was sitting in the back seat of the auto as the three rode down Interstate 90, gave the police further cause. Finally, the crashing through the red light as if to elude the police following them was suspicious. Although not one of these incidents standing alone will rise from the level of mere suspicion to probable cause, taken together, these circumstances gave the officers probable cause to believe there was contraband in the vehicle. Hence, the totality of the circumstances in this case gave the police probable cause.

3. Stop and Frisk Exception

A third rationale for finding the search in the instant case to be lawful is the stop and frisk exception enunciated in *Terry* v. *Ohio* (1968), 392 U.S. 1 [44 O.O.2d 383].[7] In *Terry,* the court held that where a police officer has articulable facts which amount to a reasonable suspicion that a person has committed, is committing, or is about to commit a crime, the officer may stop and detain that person and frisk him for weapons if the officer believes his safety is threatened.

In *Adams* v. *Williams* (1972), 407 U.S. 143, the court went beyond its holding in *Terry* and held that where an officer, acting upon an informant's tip, reached into a car in which defendant was seated and removed a gun from precisely the place the informant indicated the gun would be, the officer's action in reaching to the spot for the gun was a limited intrusion and therefore reasonable. Defendant's arrest for carrying concealed weapons was held to be lawful.

The District of Columbia Circuit took *Adams* one step further in a case very similar to the case at bar. In *United States* v. *Purry* (C.A.D.C. 1976), 545 F. 2d 217, the defendant was seen walking rapidly, sweating profusely and looking excited. He also had dirt on his legs, suggesting he had fallen. A police officer who observed him suspected he may have been involved in a bank robbery that had just taken place. The policeman stopped the defendant to determine his identity and question him. The court held that under *Terry* and *Adams,* the police officer had reasonable suspicion to believe the defendant had committed a crime. The stop was therefore lawful.

In the instant case, the police officers had reasonable suspicion to believe Bezak, Burke and Congeni had committed a crime, that crime being conspiracy to commit robbery.[8] In addition, the officers believed their safety was threatened. Officer Velkoff stated that the three men were within reaching distance of the guns and that he feared for his and other officers' safety.[9] In light of these facts, the detention and subsequent search for weapons was lawful.

The first assignment of error is not well taken.

II

"The trial court erred in denying the appellant's motion for acquittal pursuant to Rule 29 as the state failed to prove each

---

[7] See, also, *United States* v. *Brignoni-Ponce* (1975), 422 U.S. 873; *Adams* v. *Williams* (1972), 407 U.S. 143; *Sibron* v. *New York* (1968), 392 U.S. 40 [44 O.O.2d 402].

[8] It is noted that under the facts in this case, the police not only had reasonable suspicion these three men had committed a crime, they also had probable cause to believe so. See Part 1, *supra; State* v. *Smith* (1978), 56 Ohio St. 2d 405, 409, fn. 2 [10 O.O.2d 515].

[9] Even if the weapons were not within the men's reach, the officer's conduct in looking in the seat would still be reasonable. See *State* v. *Brown* (1978), 160 N.J. Super. 227, 389 A. 2d 507, where, in a fact pattern similar to the case at bar, the court found that the defendant's furtive gestures in concealing the weapon gave the officer the reasonable belief he may be in danger when the defendants returned to the vehicle.

and every element of the offense beyond a reasonable doubt."

In his second assignment of error, appellant argues that the trial court erred in denying his motion for acquittal pursuant to Crim. R. 29.[10] Appellant's contention is that the state failed to prove beyond a reasonable doubt that the appellant aided and abetted a principal in concealing a deadly weapon and that the appellant knowingly possessed a deadly weapon. R.C. 2923.12(A) provides:

"No person shall knowingly carry or have, concealed on his person or concealed ready at hand, any deadly weapon or dangerous ordnance."

R.C. 2923.03 states, in part:

"(A)   No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

"* * *

"(2)   Aid or abet another in committing the offense."

The record reveals that Burke was seated in the back seat of the auto and shoved the guns into the crevice of the back seat. Congeni was seated in the front passenger's seat and conversed with Burke while Burke was engaged in this activity. Although Congeni's mere presence was not sufficient to make him an accomplice, it is clear from the totality of the circumstances that Congeni incited or encouraged Burke to hide the weapons.

See *State* v. *Shepard* (1968), 15 Ohio App. 2d 88 [44 O.O.2d 209].

Accordingly, Congeni's second assignment of error is overruled.

### III

"The trial court erred, committing prejudicial reversible error, by giving jury instructions which suggested that mere association with a principal was sufficient evidence to convict appellant as an aider and abettor and by denying appellant's request for instructions on 'the mere presence' rule. The action of the trial judge so infected the trial that the resulting conviction violated appellant's Fourteenth Amendment right to due process of law."

In the third assignment of error, appellant maintains the court erred in its instructions to the jury. The record reveals that appellant failed to object to these instructions at trial. Because of his failure to object, appellant cannot raise this error on appeal.[11] Crim. R.   30; *State* v. *Williams* (1977), 51 Ohio St. 2d 112 [5 O.O.2d 98]; *State* v. *Lane* (1976), 49 Ohio St. 2d 77 [3 O.O.3d 45]; *State* v. *Slone* (1975), 45 Ohio App. 2d 24 [74 O.O.2d 66].

### IV

"The trial court erred in admitting unreliable hearsay evidence as substantive proof of appellant's guilt thus violating appellant's Sixth and Four-

---

[10] Crim. R. 29(A) provides that an accused shall be acquitted where the "evidence is insufficient to sustain a conviction of such offense * * *."

[11] It is noted that in *State* v. *Long* (1978), 53 Ohio St. 2d 91 [7 O.O.3d 178], and *State* v. *Lockett* (1976), 49 Ohio St. 2d 48 [3 O.O.3d 27], the Ohio Supreme Court held that although failure to timely object to a jury instruction constitutes a waiver of any error in the instruction, where the outcome of the trial would have been clearly otherwise, such error is plain error pursuant to Crim. R. 52(B). In

this case, the instructions appellant now takes issue with were as follows:

"A person who knowingly or purposely aids, helps, assists, encourages or directs or associates himself with another for the purpose of committing or in the commission of the crime of carrying a concealed weapon or receiving or retaining stolen property is regarded as if he were the principal offender and is just as guilty as if he personally performed every act constituting the offense."

We are persuaded that such instructions were not erroneous and therefore cannot constitute plain error.

teenth Amendment rights to confrontation of witnesses and depriving him of a fair trial and due process of law."

In this final assignment of error, appellant maintains the trial court erred in admitting hearsay into evidence, in contravention of appellant's Sixth and Fourteenth Amendment rights. The hearsay appellant refers to is the information obtained from an informant. Appellant's contention is not well taken. Hearsay by definition is an out-of-court statement offered to prove the truth of the matter asserted. Evid. R. 801(C). The informant's tip was not used for its truthfulness but merely to explain the police's actions. It is irrelevant whether the tip was true or not because the police observed sufficient furtive actions on appellant's part to warrant the search. See Part 1 of Assignment of Error I, *supra*. The tip merely explained the officers' presence at the scene.

Accordingly, the informant's tip was not hearsay and was properly admitted. Appellant's fourth assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

CORRIGAN, and STILLMAN, JJ., concur.

STILLMAN, J., retired, of the Eighth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.